**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JANE DOE,<br>*Plaintiff*,<br>v.<br>JOHN/JANE DOES 1-4, all individuals,<br>*Defendants*. | Civil Action No. _______________<br><br>JURY TRIAL DEMANDED |

## VERIFIED COMPLAINT

Plaintiff, Jane Doe, for her complaint against Defendants, John/Jane Does 1-4, alleges as follows:

## INTRODUCTION

1. This is a defamation, false light, and privacy action brought by a private individual who has been falsely and publicly identified—by name, photograph, home addresses, and personal telephone numbers—as a woman who had a sexual relationship with convicted sex offender Jeffrey Epstein. Plaintiff is not that woman. Defendants, posting from accounts on X (formerly Twitter), seized on the release of the so-called "Epstein files" to falsely accuse Plaintiff of having a criminal and/or sexual relationship (with graphic descriptions of sexual acts) with Epstein, and then doxxed her—publishing her full name, age, employment and education history, residential addresses, telephone numbers, a photograph, and family members' names—to a global audience of hundreds of thousands and, collectively, over one million viewers. Plaintiff brings this action under a pseudonym because disclosure of her true identity in these proceedings would re-inflict and compound the very harm she seeks to redress: the false public association of her name with Epstein's sexual crimes and the attendant threats to her safety and privacy. Plaintiff will move for

expedited discovery to subpoena X Corp. (and any other connected social media accounts) for account-holder information sufficient to identify the Doe Defendants so they can be named, served, and held accountable.

**PARTIES**

2. Plaintiff Jane Doe, suing under a fictitious name, is an adult individual who is a citizen of New York, where she has resided since 2026.

3. Simultaneously with this filing, Plaintiff is filing a motion to proceed anonymously. She has taken extensive steps to preserve her anonymity and safety, and to minimize the ongoing damage to her mental health since the time Defendants' posts described herein went viral. These steps include Plaintiff quitting her job due to the fear that someone might come to her now-former workplace and harm, humiliate, or falsely expose her; and moving from Pennsylvania to New York in hopes that those who viewed the posts at issue would not be able to locate her at a new address.

4. Disclosure of Plaintiff's identity in connection with this lawsuit would re-associate her name with the false accusation of a sexual relationship with a convicted sex offender and trafficker, compound the doxxing harm already inflicted, and expose her to further online harassment, threats, and real-world danger.

5. The stigma of being publicly identified—even as a plaintiff seeking to vindicate her rights—as connected to Epstein's sexual crimes constitutes severe harm well beyond mere embarrassment. Plaintiff has no ulterior motive in seeking anonymity; she seeks only to protect herself and her family from the consequences of Defendants' tortious conduct.

6. Plaintiff was a citizen of Pennsylvania at the time the defamatory and false light statements alleged herein were made until 2026, when she moved to New York in an effort to

protect her safety and mitigate the mental trauma she was suffering as a result of the posts at issue. The harm Defendants caused Plaintiff was centered in Pennsylvania.

7. Defendant John/Jane Doe 1, sued under a fictitious name, is an individual known online as “Eren Türkmen” with the X account handles “@erenturkmen” and “@ProfesorTurkmen” and Instagram account handles “eren_turkmen” and possibly “profesorsteam” but whose true name and identity is presently unknown.

8. Doe 1 is believed to be a citizen of Turkey and has been at all times relevant to this complaint.

9. Defendant John/Jane Doe 2, sued under a fictitious name, is an individual known online as “Basak Sezen” with the X account handle “@BasakSezen2” and Instagram account handle “basaksezen34” but whose true name and identity is presently unknown.

10. Doe 2 is believed to be a citizen of Turkey and has been at all times relevant to this complaint.

11. Defendant John/Jane Doe 3, sued under a fictitious name, is an individual known online as “SOLUCAN X” with the X account handle “@tanrizeusu” but whose true name and identity is presently unknown.

12. Doe 3 is believed to be a citizen of Turkey and has been at all times relevant to this complaint.

13. Defendant John/Jane Doe 4, sued under a fictitious name, is an individual known online as “TCDEFENCE” with the X account handle “@tcdefence” and Instagram account handle “tcdefense” but whose true name and identity is presently unknown.

14. Doe 4 is believed to be a citizen of Turkey and has been at all times relevant to this complaint.

15. Plaintiff does not know the true names and identities of Defendants and cannot ascertain them without first issuing subpoenas to X Corp. and/or Instagram (Meta Platforms, Inc.) for their account information. Each Defendant operates under a pseudonymous X and/or Instagram account(s) to conceal their identities. Plaintiff has undertaken reasonable efforts to identify Defendants through searches of online profiles and posts, publicly available information, and legal proceedings overseas, but those efforts have been unsuccessful. X Corp. and Instagram maintain records, including but not limited to account registration information, IP addresses, email addresses, and telephone numbers, that should enable Plaintiff to identify and serve Defendants. Without discovery, Plaintiff cannot identify Defendants and serve process in order to proceed with this action. Time is of the essence because X Corp.'s and Instagram's data-retention policies may result in the destruction of identifying records if subpoenas are not issued and served promptly.

16. Plaintiff will file a motion for expedited discovery so that she may issue and serve one or more subpoenas on X Corp. and/or Instagram (Meta Platforms, Inc.) to discover the identities of Defendants. Upon learning that information, Plaintiff will amend this complaint to substitute in their true names and additional identifying information.

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the parties are of diverse citizenship, Defendants are citizens of a foreign state, and the matter in controversy is in excess of $75,000, exclusive of interest and costs.

18. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District and Defendants are subject to this Court's personal jurisdiction.

19. Defendants are subject to personal jurisdiction in this Court because Defendants committed intentional torts described in this complaint knowing, or having reason to know, that

Plaintiff resided in Pennsylvania at the time of their tortious acts such that the brunt of the harm of their acts would be suffered in Pennsylvania. Defendants knew or had reason to know Plaintiff resided in Pennsylvania at the time of their tortious actions because: (a) Doe 2 published Plaintiff's complete residential history, which included a Pennsylvania city in this district; (b) Doe 3 published Plaintiff's residential address in Pennsylvania; and (c) the threaded nature of Defendants' posts meant each Defendant had access to this Pennsylvania-specific information. Defendants' defamatory posts and tortious acts were expressly aimed at Plaintiff in Pennsylvania, and the greatest harm caused by those posts was suffered by Plaintiff in Pennsylvania, where she maintained her personal and professional life at the time of the tortious acts.

## FACTUAL ALLEGATIONS

### I. Plaintiff Met Epstein Once in 2013 and Rejected Any Further Contact

20. Plaintiff was invited by a former contact to a dinner in 2013.

21. At the dinner, Plaintiff met a woman, who Plaintiff later learned was Epstein's personal assistant, but who identified herself only as working for a non-profit organization. They discussed public policy, tennis, and humanitarian work. After learning that Plaintiff was searching for employment, the woman asked for Plaintiff's resume, which Plaintiff provided.

22. After the dinner, the woman arranged for Plaintiff to meet her at what turned out to be an Epstein residence, where Plaintiff met Epstein. Plaintiff was deeply disturbed by the encounter and told his personal assistant never to invite her to see Epstein again.

23. Plaintiff never had any other contact with Epstein.

24. In the years following, Plaintiff built her professional career in finance and consultancy services. She heard nothing further about Epstein other than what was in the news.

**II. In 2026, Plaintiff Discovered Her Name Appeared in the "Epstein Files"**

25. In February 2025, the United States Department of Justice began releasing tranches of investigatory and other materials to the public "related to convicted sex offender Jeffrey Epstein and his sexual exploitation of over 250 underage girls at his homes in New York and Florida, among other locations."[1]

26. The files that have been released since February 2025 have come to be known as the "Epstein files." The Epstein files and reports about Epstein himself have garnered widespread media and social media attention.

27. Plaintiff's full name and other personally identifying information appeared in the Epstein files when they were released and for a period of time thereafter. That is because the Department of Justice released an unredacted copy of the resume that Plaintiff provided to Epstein's personal assistant following the dinner in 2013.

28. By chance, the Epstein files describe at least two women sharing Plaintiff's national origin: (a) Plaintiff herself, whose name and identifying information appear on the resume she happened to give Epstein's personal assistant in 2013; and (b) another woman, whose full name is redacted in the Epstein files and who is described as having an ongoing sexual relationship with Epstein and/or participating in acts that constitute or are associated with sexual exploitation and trafficking. For simplicity and clarity going forward, this complaint will refer to the other woman referenced here as "Ms. A."

---

[1] https://www.justice.gov/opa/pr/attorney-general-pamela-bondi-releases-first-phase-declassified-epstein-files

29. To summarize what will be detailed later, Defendants reviewed and posted about the Epstein files, accusing Plaintiff of being Ms. A, and of having a sexual relationship with Epstein and/or of participating in his criminal acts.

## III. Defendants Coordinated Efforts to Identify and Publicly "Out" Ms. A, Falsely Accusing Plaintiff of Being That Person

30. In January 2026, Doe 1 posted about Plaintiff on the social media site X.

31. Doe 1's purpose and intent in making the posts on X, described below, was to associate Plaintiff with the Epstein files, to aid and encourage others to do the same by recklessly revealing the identity of Plaintiff, and to aid and encourage Doe 1's followers to publicly identify Plaintiff and target her to be doxxed, harassed, and shamed for a sexual or criminal association with Epstein that Doe 1 knew belonged to someone other than Plaintiff.

32. Doe 1 posted on X, "there is mention of a '[Ruritanian][2] woman who never left Jeffrey Epstein's side[.]'" The post further stated that this woman (Ms. A) wanted a child with Epstein and described specific alleged sexual acts between this woman (Ms. A) and Epstein in graphic detail.

33. Doe 1 also posted on X, "In the Epstein files, there are 6 people from [Ruritania] whose names appear in the flight logs and accommodation sections."

34. Doe 1 claimed as fact on X that he knew the identity of the woman or women who never left Epstein's side. Specifically, Doe 1 posted, "I know their names but I write them vaguely. Once you connect the dots between the emails, everyone's name and identity becomes clear." Doe

---

[2] Plaintiff is using the fictional country of "Ruritania" for readability, rather than the actual name of the country in the Epstein files since the mention of that actual country was, and still could be, used to falsely identify Plaintiff as Ms. A because both share the same native country.

1 further stated, "I have them all" and posted the first name of Plaintiff and stated that she was from Ruritania.

35. Doe 1 then encouraged his followers to connect the identity dots to Ms. A and gave them assistance to do so.

36. In response, one of Doe 1's followers asked in a post if Ms. A was in fact Plaintiff.

37. Another follower responded by posting Plaintiff's name and picture and suggesting that Plaintiff must be Ms. A.

38. Commenters reviewing the exchange replied by making comments to the effect that they agreed that Doe 1 and his followers had identified Plaintiff as Ms. A.

39. Another of Doe 1's followers responded to Doe 1's initial post by posting on X Plaintiff's picture, phone numbers (including one with a Pennsylvania area code), and places where she lived, including a town in this judicial district. The post claimed Plaintiff was Ms. A.

40. Doe 1, who claimed to know Ms. A's identity, never told his followers that they were wrong that Plaintiff was Ms. A even though Doe 1 had facts that proved she was not.

41. In January and February 2026, Doe 2 posted about Plaintiff on the social media site X.

42. Doe 2, in the same thread(s) started by Doe 1, posted on X the first name of Plaintiff and falsely connected her to Ms. A. Along with this post, Doe 2 posted an image of Plaintiff's resume that included her full name and employment and education history, as well as information about where she might live.

43. Still in relation to the Epstein files, Doe 2 posted on X, "It seems to be confirmed that [Ruritanian] girls were also abducted . . . It refers to a [Ruritanian] girl who had a relationship with Epstein . . . ."

44. This post was accompanied by an excerpt from a government document describing in explicit terms the sexual conduct of a "[Ruritanian] girl," whose name was redacted, who "frequently engaged in anal sex with Epstein."

45. Doe 2's statements were designed to encourage and assist her followers to publicly identify Plaintiff and target her to be doxxed, harassed, and shamed for a sexual or criminal association with Epstein that belonged to someone else, not Plaintiff.

46. In February 2026, Doe 3 posted about Plaintiff on the social media site X.

47. Doe 3, in the same thread(s) started by Doe 2, posted on X that he identified the [Ruritanian] woman whose name was redacted in the Epstein files as Plaintiff, revealing her full name and falsely stating that she was Ms. A, who had a sexual association with Epstein.

48. In the same post, Doe 3 also published Plaintiff's private personal information, including her full name, her age, her residential addresses, her personal telephone numbers, the names of her family members, and a photograph of Plaintiff.

49. Along with posting Plaintiff's personal information, Doe 3 wrote "Apparently this [Ms. A] is a [Ruritanian] girl. Pennsylvania is involved too, strangely. Take a look at this girl as well. What is the network of connections?"

50. In February 2026, Doe 4 posted about Plaintiff on the social media site X.

51. Doe 4 posted that Plaintiff was one of the people who ran Epstein's sexual trafficking organization.

## IV. Defendants' Statements About Plaintiff Were False

52. All the foregoing X posts by Defendants are about Plaintiff because each identifies her by her full name, her picture, or other information that readers could and/or did connect to her, such as her first name and native country, which could be easily searched within the Epstein files.

53. All the foregoing X posts by Defendants about Plaintiff are also false.

54. Plaintiff is not Ms. A or any of the other women whose names are redacted in the Epstein files who had a sexual association with Epstein or participated in his illegal activities.

55. Plaintiff never had a sexual association with Epstein or participated in his illegal activities.

56. Defendants knew or were reckless about this falsity and had no good faith basis to claim that Plaintiff was the woman (Ms. A) or one of the women whose names are redacted in the Epstein files and who had a sexual association with Epstein or participated in his illegal activities.

57. Nor did Defendants have any basis to otherwise claim that Plaintiff ever had a sexual association with Epstein or participated in his illegal activities.

58. The Epstein files themselves showed that the woman (Ms. A), or one of the women, whose name was redacted and who allegedly had a sexual association with Epstein or participated in his illegal activities, had lived in a particular city overseas. Defendants knew or should have known this fact since they had reviewed the Epstein files. Yet Defendants falsely linked Plaintiff to that individual in their posts, even though the same files showed that Plaintiff had never lived in that city.

59. Further, in a February 2026 X post, Doe 2 published Plaintiff's complete residential history, which did not include the overseas city where that woman (Ms. A) or those women had lived. The other Defendants would have seen this post because it was part of their collective discussions on X.

60. Moreover, apart from the city discrepancy, Plaintiff denied the connection to Epstein in the thread of Defendants' posts in February 2026. Still, Defendants left their false X posts online to continue to garner views and engagement.

61. Each of Defendants' false posts has generated, and continues to generate, thousands or more views, numerous comments and reactions, and multiple reposts by other users, resulting in the continued dissemination of the false and defamatory statements.

62. Readers of the false posts did and would think less of Plaintiff because of the defamatory statements and implications, including that Plaintiff had a sexual association with Epstein or participated in his illegal activities.

63. As a result of the false posts, Plaintiff has suffered damages: (a) severe emotional distress, anxiety, fear for her personal safety and that of her family members, severe stress, and panic attacks that have severely impacted her daily life, as well as the need for mental health counseling; (b) reputational harm, including inquiries from professional colleagues, clients, and personal acquaintances questioning her character and integrity; (c) economic losses, including lost employment after Plaintiff felt compelled to quit her job out of fear of exposure and humiliation, after she was contacted at her work email address by someone asking—based on X posts by Doe 1 and possibly other Doe defendants—whether she was the woman (Ms. A) mentioned in the Epstein files; and (d) ongoing harm from the continued public availability of the false and defamatory posts and of her private information, which as of the date of this complaint have generated over one million views collectively.

**COUNT I**
**Defamation**
***(Plaintiff v. All Defendants)***

64. Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

65. Plaintiff is a private figure who has not injected herself into any public controversy.

66. Defendants made and published defamatory statements about Plaintiff, without privilege or justification, to third parties on the social media site X.

67. The defamatory statements falsely accused Plaintiff of involvement in criminal activity, sexual misconduct, and illicit sexual behavior.

68. Readers of these statements understood their defamatory meanings and implications, as well as that the statements were intended to be applied to Plaintiff.

69. These statements are defamatory *per se*, as they state and imply, among other things, that Plaintiff committed criminal offenses (e.g., participation in sexual trafficking or exploitation) and engaged in serious sexual misconduct.

70. Moreover, these statements injured and prejudiced Plaintiff in her professional and personal endeavors.

71. At a minimum, these statements tended to lower Plaintiff's reputation in the estimation of the community and/or deter third persons from associating or dealing with her, and she suffered special damages as set forth above.

72. The defamatory statements were, and still are, false. Plaintiff never had a sexual association with Epstein or participated in his illegal activities.

73. Defendants made and published the false and defamatory statements with actual or constructive knowledge that they were false or with reckless disregard as to whether they were true or false—and in an effort to malign Plaintiff's reputation within the community for the sake of internet publicity.

74. Alternatively, Defendants made and published the false and defamatory statements negligently, without exercising a reasonable level of care and diligence to ascertain the truth.

75. As a direct and proximate result of the defamatory *per se* statements and/or defamatory statements made with actual malice, Plaintiff suffered and continues to suffer presumed damages in an amount to be determined at trial.

76. As a direct and proximate result of the defamation, Plaintiff suffered and continues to suffer reputational harm, emotional distress, mental pain and suffering, embarrassment, humiliation, aggravation, financial and other damages in an amount to be determined at trial.

77. Defendants' conduct was willful, malicious, intentional, wanton, and/or reckless, thereby entitling Plaintiff to an award of punitive damages in an amount to be determined at trial.

**COUNT II**
**False Light**
***(Plaintiff v. All Defendants)***

78. Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

79. Defendants publicized statements and depictions concerning Plaintiff on the social media site X, to audiences numbering in the hundreds of thousands and, collectively, over one million viewers.

80. Defendants' statements and depictions placed Plaintiff in a false light by falsely portraying her as having had a sexual association with Epstein or having participated in his illegal activities.

81. Plaintiff never had a sexual association with Epstein or participated in his illegal activities.

82. The false light in which Defendants placed Plaintiff would be highly offensive to a reasonable person.

83. Being publicly identified as having had a sexual association with Epstein or having participated in his illegal activities, including sexual trafficking, is among the most damaging and stigmatizing portrayals imaginable, particularly when broadcast to a global audience and accompanied by the public disclosure of Plaintiff's private personal information.

84. Defendants made and published false statements with actual or constructive knowledge that they were false or with reckless disregard as to whether they were true or false.

85. As a direct and proximate result of the false light, Plaintiff suffered and continues to suffer reputational harm, emotional distress, mental pain and suffering, embarrassment, humiliation, aggravation, financial and other damages in an amount to be determined at trial.

86. Defendants' conduct was willful, malicious, intentional, wanton, and/or reckless, thereby entitling Plaintiff to an award of punitive damages in an amount to be determined at trial.

## COUNT III
**Public Disclosure of Private Facts—Doxxing**
***(Plaintiff v. Doe 2, Doe 3)***

87. Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

88. Doe 2 publicly posted Plaintiff's resume on X, which contained her full name, employment and education history, and other personally identifying information that could be used to locate and harass Plaintiff.

89. Doe 3 publicly posted Plaintiff's private personal information, including her full name, her age, her residential addresses, her personal telephone numbers, the names of her family members, and a photograph of Plaintiff, on X.

90. In doing so, Doe 2 and Doe 3 publicly disclosed private facts about Plaintiff on the social media site X.

91. None of this information was or should have been a matter of public record. The separate and/or collective disclosure and aggregation of such private information in connection with false allegations of sexual involvement with a convicted sex offender exposed Plaintiff to a concrete and substantial risk of physical harm, stalking, and targeted harassment.

92. The disclosure, which continues to this day, would be highly offensive to a reasonable person.

93. None of the private facts about Plaintiff were of legitimate public concern.

94. As a direct and proximate result of the disclosure, Plaintiff suffered and continues to suffer emotional distress, mental pain and suffering, embarrassment, humiliation, aggravation, financial and other damages in an amount to be determined at trial.

95. Doe 2's and Doe 3's conduct was willful, malicious, intentional, wanton, and/or reckless, entitling Plaintiff to an award of punitive damages in an amount to be determined at trial.

**COUNT IV**
**Aiding and Abetting**
***(Plaintiff v. All Defendants)***

96. Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

97. Defendants had actual knowledge of the tortious conduct described herein, including the defamatory statements, false-light publications, and/or disclosures of Plaintiff's private information.

98. With that knowledge, Defendants knowingly and substantially assisted, encouraged, directed, coordinated, and/or facilitated each other's tortious conduct.

99. Among other things, Defendants used threaded social-media posts to assist and encourage one another and their followers to identify Plaintiff publicly, associate her falsely with

Epstein, disclose her personal identifying information, and subject her to doxxing, harassment, and public ridicule.

100. This led to Defendants and others in fact doxxing, harassing, and shaming Plaintiff for a false sexual or criminal association with Epstein.

101. Defendants' substantial assistance and encouragement was a substantial factor in the commission of the foregoing torts and in the widespread dissemination of false statements and private information.

102. As a direct and proximate result of Defendants' aiding and abetting, Plaintiff was falsely associated with Epstein, was doxxed, harassed, and publicly shamed, and suffered reputational harm, emotional distress, mental anguish, embarrassment, humiliation, financial losses, and other damages in an amount to be determined at trial.

103. Defendants' conduct was willful, malicious, intentional, wanton, and/or reckless, thereby entitling Plaintiff to an award of punitive damages in an amount to be determined at trial.

WHEREFORE**,** Plaintiff respectfully requests judgment against Defendants, jointly and severally, for presumed, compensatory, and punitive damages in an amount to be proven at trial and exceeding $75,000, plus costs, pre- and post-judgment interest, equitable relief (including orders that enjoin the continued publication of the defamatory and false light statements and require Defendants to retract and remove all publications of those statements and disclosures of private information), and such other and further relief as the Court deems just and appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Dated: November 6, 2026

**FOX ROTHSCHILD LLP**

*/s/ Samantha Banks*

Samantha Banks (PA Bar No. 319401)
Two Commerce Square
2001 Market Street, Suite 1700
Philadelphia, Pennsylvania 19103
Tel: (215) 299-2000
Fax: (215) 299-2150
sbanks@foxrothschild.com

Joseph L. Meadows (pro hac to be filed)
Stefan Palys (pro hac to be filed)
2020 K Street NW, Suite 500
Washington, DC 20006
Tel: (202) 461-3100
Fax: (202) 461-3102
jmeadows@foxrothschild.com
spalys@foxrothschild.com

*Counsel for Plaintiff Jane Doe*

**VERIFICATION**

I declare under penalty of perjury that the foregoing factual allegations are true and correct. Executed on November 3___________, 2026.

_________________________

Plaintiff Jane Doe